475 A.2d 1192

# MARYLAND COMMISSION ON HUMAN RELATIONS

## v.

# GREENBELT HOMES, INC.

No. 8 (Adv.) Sept. Term, 1983.

Court of Appeals of Maryland.

June 7, 1984.

Risselle Rosenthal Fleisher, Gen. Counsel, Baltimore (Glendora C. Hughes, Asst. Gen. Counsel and Philip L. Marcus, Associate Gen. Counsel, Baltimore, on the brief), for appellant.

Lester B. Seidel, Washington, D.C. (James F. Perna and Krooth & Altman, Washington, D.C., on the brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

COLE, Judge.

In this case we must determine whether enforcing a housing cooperative regulation that operates to prohibit a female resident from having an unrelated adult male reside with her constitutes discrimination on the basis of "marital status" proscribed by Maryland Code (1957, 1979 Repl.Vol.), Art. 49B, § 20. The relevant facts are not disputed.

Greenbelt Homes, Inc. (Greenbelt) is a Maryland corporation operating a housing cooperative in Greenbelt, Maryland. In 1976, Raymond and Marguerite Burgess (Burgess) applied for a Greenbelt membership. Their daughter, C. Lynn Kuhr (Kuhr), and her son were to be the residents of the unit; therefore, Kuhr also was required to file an application with Greenbelt. On this application, Kuhr indicated that only she and her son would be living in the unit. The Greenbelt board of directors granted Burgess permis-

sion to have their daughter and her son dwell in their unit and on November 15, 1976, Burgess entered into a mutual ownership contract with Greenbelt purchasing the equity and perpetual use of a housing unit in the Greenbelt Housing Project. This contract provided that the corporation could impose reasonable rules and regulations in managing the project and specifically noted that occupancy of the unit was only for the cooperative member and "his immediate family." If the member violated any provisions of the agreement, the corporation could terminate the contract. Furthermore, a Greenbelt occupancy regulation specifically defined "family members." *See infra* p. 80.

Kuhr and her son moved into the unit shortly after her parents executed the contract. Sometime thereafter Richard Searight, an unrelated adult male, also moved into the unit. Neither Kuhr nor her parents ever sought a waiver of the contractual provision limiting occupancy to immediate family members. In May of 1978, Greenbelt became aware of Mr. Searight's presence in the unit after receiving complaints from other cooperative members about parking and other problems relating to the occupancy of the Kuhr unit. Greenbelt advised Kuhr and her parents that having this unrelated adult occupy the unit violated the mutual ownership contract and urged them to "straighten out" the situation. When the matter had not been resolved by September of 1978, Greenbelt notified Burgess of a board of directors meeting at which they could explain why their contract should not be terminated. Before this meeting, Kuhr notified Greenbelt that Mr. Searight would be vacating the unit (which he in fact did "against his will and against the will of [Kuhr]").

Prior to Searight's exodus, Kuhr filed a housing discrimination complaint with the Maryland Commission on Human Relations (Commission) pursuant to Maryland Code (1957, 1979 Repl.Vol.), Art. 49B, § 9(a), alleging that Greenbelt's conduct constituted discrimination on the basis of her "marital status, single." After concluding that there was probable cause to proceed against Greenbelt for discriminatory

conduct, the Commission issued its Statement of Charges. *See* Maryland Code (1957, 1979 Repl.Vol.), Art. 49B, § 11(a). A hearing examiner reviewed the case on stipulated facts. On August 28, 1980, he dismissed the action with prejudice, concluding that there had been a breach of the ownership contract. The Commission's counsel appealed to a three-member appeal board of the Commission, which reversed the dismissal of the Kuhr complaint and ordered Greenbelt to "cease and desist from discriminating against [Kuhr] in the terms, conditions or privileges of sale or rental of a dwelling...."

The Commission subsequently denied a request to vacate its decision and Greenbelt filed a petition in the Circuit Court for Prince George's County to review and reverse the Commission's decision. Each party moved for summary judgment. The circuit court granted Greenbelt's motion, concluding that *Prince George's County v. Greenbelt Homes*, 49 Md.App. 314, 431 A.2d 745 (1981), controlled and thus sections 19 and 20 of Article 49B had not been violated.

■ The Commission timely noted an appeal to the Court of Special Appeals and Greenbelt noted a cross-appeal. The Commission filed a petition for writ of certiorari in this Court presenting the following issue:

> Whether the prohibition of unmarried persons of the opposite sex who choose to share a dwelling space in the Greenbelt Housing Project is discrimination on the basis of marital status within the meaning of Section 20 of Article 49B of the Annotated Code of Maryland.

We granted certiorari prior to consideration by the intermediate court to resolve this important issue.[1]

---

**1.** Greenbelt argued in the circuit court and before us that the issue as presented is moot. The thrust of its argument is that Kuhr had withdrawn her complaint before the Commission's appeal board ruled on the case. We find no support for this contention in the record. While Kuhr may have indicated that she "was no longer interested in the outcome of the case" or that she "wanted to withdraw the complaint," she did nothing further to create this result. We conclude, therefore, that the complaint was not in fact withdrawn and the

Greenbelt argues that Kuhr breached the mutual owner-ship contract and, thus, it has the right to terminate her occupancy. The mutual ownership contract provides, in pertinent part, as follows:

7(a). *Occupancy:* The Member shall occupy the dwell-ing unit covered by this contract as a private dwelling from the date of occupancy ... for himself and his immediate family....

7(b). *Rules and Regulations Relating to Occupancy and Care of the Dwelling:* This Corporation reserves the right to impose any reasonable rules and regulations not inconsistent with the provisions of this contract ... as in its judgment may be necessary or desirable for the man-agement and control of Greenbelt and the Member's dwelling unit and surrounding premises, and for the preservation of good order and comfort therein, and the Member agrees faithfully to observe and comply with such rules and regulations and further agrees that all persons living in the dwelling unit also will observe and comply with such rules and regulation....

13. *Termination of Contract by Corporation for De-fault or for Cause:* In the event of default by the Member ... or violation of any of the provisions hereof, the Corporation may terminate this contract.... The Corporation may terminate this Contract ... if its board of directors ... shall determine that the Member for sufficient cause is undesirable as a resident in Greenbelt because of objectionable conduct on the part of the Mem-ber or of a person living in his dwelling unit. To violate or disregard the rules and regulations provided for in paragraph 7(b) hereof, after due warning, shall be deemed to be objectionable conduct.

The occupancy regulation amplifying section 7(a) of the contract stated:

circuit court properly held that the case is not moot. *See* Md.Rule 813(b).

That the definition of "family members" as used in GHI Mutual Ownership Contracts be clarified as follows: the following are considered as family members who may live in a GHI unit without getting GHI approval for such occupancy as long as the number of persons does not exceed GHI occupancy standards:

1. Wife, Mother, Stepmother, Mother-in-Law

2. Husband, Father, Stepfather, Father-in-Law

3. Daughter, Stepdaughter, Legally Adopted Daughter, Daughter-in-Law

4. Son, Stepson, Legally Adopted Son, Son-in-Law

5. Sister, Sister-in-Law

6. Brother, Brother-in-Law

7. Grandchildren, Grandparents

8. Foster Children—The number of foster children which a member may care for is determined by the existing family unit to insure that total occupancy standards established by Prince George's County for foster children placement are not exceeded.

The housing of any other person in a GHI unit in excess of 30 days, whether with or without compensation, without approval of the board of directors will be considered a violation of the mutual ownership contract and may result in the termination of such member's contract.

We had occasion to review these contractual provisions in *Green v. Greenbelt Homes*, 232 Md. 496, 194 A.2d 273 (1963). In that case Greenbelt sought to terminate its contract with a woman who, among other violations, was living with an unrelated adult man. The Court addressed the question "whether the provisions of the contract relating to termination were valid." *Id.* at 501, 194 A.2d 273. The Court held that the member had breached her contract with Greenbelt sufficiently to "warrant the corporation exercising its right to terminate the interests of the member in the dwelling unit." *Id.* at 504, 194 A.2d 273. In exam-

ining the issue presented in that case, the Court focused on the nature of the cooperative and its relationship to members:

An important factor in the maintenance of a cooperative housing project is the control of the activities of the cooperative members living within the project. In a recent article, *Restrictions on the Use of Cooperative Apartment Property*, by Arthur E. Wallace, 13 Hastings Law Journal, 357, 363, it is said:

"The economic and social interdependence of the tenant-owners demands cooperation on all levels of cooperative life if a tolerable living situation is to be maintained. Each tenant-owner is required to give up some of the freedoms he would otherwise enjoy if he were living in a private dwelling and likewise is privileged to demand the same sacrifices of his cotenant-owners with respect to his rights.

"By analogy, the cooperative agreement is really a community within a community governed, like our municipalities, by rules and regulations for the benefit of the whole. Whereas the use of lands within a city is controlled by zoning ordinances, the use of apartments within the cooperative project is controlled by restrictive covenants. The use of the common facilities in the project is controlled on the same theory that the use of city streets and parks is regulated. In both situations compliance with the regulations is the price to be paid to live in and enjoy the benefits of the particular organization." [*Id.* at 503–04, 194 A.2d 273.]

For these reasons, the Court recognized that the activities of cooperative members may be contractually regulated and that these regulations should be enforced.

The case *sub judice* is strikingly similar. Here, the undisputed facts demonstrate that Kuhr violated a provision of the mutual ownership contract executed by her parents, yet also governing the conduct of all those living in the

project.[2] She knew from the date the contract was signed that only her immediate family members were authorized to occupy the dwelling unit. Despite such knowledge, she allowed Mr. Searight, unrelated by blood or marriage, to live with her and at no time sought a waiver from the board of directors so as to justify his presence in the dwelling unit. Greenbelt maintains this breach should be dispositive of the issue before us.

However, as we see it, even this conduct cannot determine the issue if, indeed, the contractual covenant prohibiting persons from residing with unrelated adults violates the State anti-discrimination law. The real issue is whether Greenbelt was precluded from seeking to enforce its membership regulation because such conduct constituted an unlawful discriminatory practice under Maryland Code (1957, 1979 Repl.Vol.), Art. 49B, § 20. Section 20 provides in pertinent part:

It shall be an unlawful discriminatory housing practice, because of race, color, religion, sex, national origin, marital status, or physical or mental handicap, for any person having the right to sell, rent, lease, control, construct, or manage any dwelling constructed or to be constructed, or any agent or employee of such person:

*    *    *    *    *    *

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith.

*    *    *    *    *    *

(6) To include in any transfer, sale, rental or lease of housing any restrictive covenant that discriminates; or for any person to honor or exercise, or attempt to honor

---

2. Section 7(b) of the mutual ownership contract indicates that all residents are bound by the conditions of occupancy. Furthermore, by signing the membership application Kuhr explicitly agreed "to abide by all the laws, rules and regulations of the corporation."

or exercise any discriminatory covenant pertaining to housing.

■ Our cases make clear that when interpreting a statute, if the language is plain, unambiguous and has a definite and sensible meaning, that meaning is presumed to be that intended by the legislature. *See Gietka v. County Executive,* 283 Md. 24, 387 A.2d 291 (1978); *Hunt v. Montgomery County,* 248 Md. 403, 237 A.2d 35 (1968); *Secretary of State v. Bryson,* 244 Md. 418, 224 A.2d 277 (1966); *Central Credit v. Comptroller,* 243 Md. 175, 220 A.2d 568 (1966); *Taylor v. Ogle,* 202 Md. 273, 96 A.2d 24 (1953). Section 20 is couched in language that is clear and unambiguous. This provision of Maryland's anti-discrimination law means precisely what it says: no person shall be discriminated against in regard to housing because of that person's marital status. As we see it, "marital status" connotes whether one is married or not married.

Here, the fact that Kuhr was not married to Mr. Searight was irrelevant. It would have made no difference under the circumstances of this case if Searight had been Kuhr's best girlfriend, her favorite aunt, her destitute cousin, or her infant nephew. The point is that no one of these people, including Mr. Searight, falls within the defined class of family members in the regulation.

Nevertheless, the Commission contends that the regulation allows unmarried couples to be treated differently from married couples and this circumstance offends the statute. We see no merit in this contention. We believe Judge Lowe's opinion in *Prince George's County v. Greenbelt Homes,* 49 Md.App. 314, 319–20, 431 A.2d 745 (1981), states a clear response to the Commission.

> Only marriage as prescribed by law can change the marital status of an individual to a new legal entity of husband and wife. The law of Maryland does not recognize common law marriages (*Henderson v. Henderson,* 199 Md. 449, 454, 87 A.2d 403 (1952)) or other unions of two or more persons—such as concubinage, syneisaktism,

relationships of homosexuals or lesbians—as legally bestowing upon two people a legally cognizable marital status. Such relationships are simply illegitimate unions unrecognized, or in some instances condemned, by the law.

Moreover, in our view, the legislature has intended to promote rather than denigrate the institution of marriage. Subsection 7 of § 20 illustrates the point by making it an unlawful practice "[t]o refuse to consider both applicants' income when both parties to a *marriage* seek to buy or lease any dwelling." [Emphasis supplied.] We find nothing in this statute which tends to elevate an individual's relationship with other persons to the level achieved by marriage. In our view, the directors of a cooperative project may reasonably expect to maintain a more stable community by restricting occupancy to those who enjoy a close and definite familial relationship.

Our conclusion that Kuhr was not discriminated against because of her marital status is buttressed by an analysis of similar cases from other jurisdictions. For instance, the New York courts have addressed a similar issue in *Hudson View Properties v. Weiss,* 106 Misc.2d 251, 431 N.Y.S.2d 632 (1980), *rev'd,* 109 Misc.2d 589, 442 N.Y.S.2d 367 (1981), *rev'd,* 86 A.D.2d 803, 448 N.Y.S.2d 649 (1982), *rev'd,* 59 N.Y.2d 733, 463 N.Y.S.2d 428, 450 N.E.2d 234 (1983). In that case, the landlord served a notice to cure upon Ms. Weiss for "allowing a person who is not a tenant to reside in and occupy the premises." The landlord subsequently served upon the tenant a notice purporting to terminate the tenancy because the violation had not been cured. Ms. Weiss did not surrender the premises and the landlord instituted a holdover proceeding. Ms. Weiss moved to dismiss because:

"... the landlord through his attorney has stated that if I marry Mr. Wertheimer, he will withdraw his claim that I have violated the lease and will not seek to evict me. If I remain single, this action will continue. I am moving to dismiss on the grounds that these actions violate the

State Human Rights Law [Executive Law] § 296(5)(a) and the City Human Rights Law § B1–7.0(5a) which prohibit discrimination in housing on the basis of marital status." [442 N.Y.S.2d at 369.]

The relevant provision of the New York Human Rights Law (§ 296(5)(a)) stated:

"It shall be an unlawful discriminatory practice for the owner ... or managing agent of, or other person having the right to sell, rent, or lease a housing accommodation ... or any agent or employee thereof: (1) To refuse to sell, rent, lease or otherwise deny to or withhold from any person or group of persons such a housing accommodation because of the ... marital status of such person or persons [L.1975 ch. 803, eff. on the 60th day after August 9, 1975]." [442 N.Y.S.2d at 369.]

The Appellate Term of the Supreme Court, First Department, reversed the lower court's decision to grant the tenant's motion to dismiss, 106 Misc.2d 251, 431 N.Y.S.2d 632 (1980), noting that the landlord's pleading was not defective on its face. See 109 Misc.2d 589, 442 N.Y.S.2d 367, 370 (1981). That court was reversed on appeal, 86 A.D.2d 803, 448 N.Y.S.2d 649 (1982); however, the New York Court of Appeals again reversed, agreeing with the intermediate appellate court. See 59 N.Y.2d 733, 463 N.Y. S.2d 428, 450 N.E.2d 234 (1983). That court stated:

In this case, the issue arises not because the tenant is unmarried, but because the lease restricts occupancy of her apartment, as are all apartments in the building, to the tenant and the tenant's immediate family. Tenant admits that an individual not part of her immediate family currently occupies the apartment as his primary residence. Whether or not he could by marriage or otherwise become a part of her immediate family is not an issue. The landlord reserved the right by virtue of the covenant in the lease to restrict the occupants and the tenant agreed to this restriction. Were the additional tenant a female unrelated to the tenant, the lease would be violated without reference to marriage. The fact that

the additional tenant here involved is a man with whom the tenant has a loving relationship is simply irrelevant. The applicability of that restriction does not depend on her marital status. [463 N.Y.S.2d at 429.]

The case upon which the New York court in *Hudson View Properties,* relied, *Manhattan Pizza Hut v. New York State, Etc.,* 51 N.Y.2d 506, 434 N.Y.S.2d 961, 415 N.E.2d 950 (1980), held that an employer's anti-nepotism rule, precluding an employee from working under the supervision of a relative (including a spouse) did not violate the human rights law prohibition against discrimination attributable to an individual's "marital status." In construing the meaning of that term the court noted:

*[T] he plain and ordinary meaning of "marital status" is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage.* Illuminated another way, when one is queried about one's "marital status", the usual and complete answer would be expected to be a choice among "married", "single", etc., but would not be expected to include an identification of one's present or former spouse and certainly not the spouse's occupation. [434 N.Y.S.2d at 964 (emphasis supplied).]

*See also Thomson v. Sanborn's Motor Express, Inc.,* 154 N.J.Super. 555, 382 A.2d 53 (1977); *McFadden v. Elma Country Club,* 26 Wash.App. 195, 613 P.2d 146 (1980). *But cf. Miller v. C.A. Muer Corp.,* 124 Mich.App. 780, 336 N.W.2d 215 (1983).

■ Accordingly, we hold that § 20's prohibition against marital status discrimination does not preclude a housing cooperative from enforcing a contractual obligation restricting occupancy to persons in the member's immediate family. Thus, Greenbelt did not discriminate against Kuhr based on her "marital status."

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.

DAVIDSON, Judge, dissenting:

I agree with the majority that the language of Maryland Code (1957, 1979 Repl.Vol.), Art. 49B, § 20 is "clear and unambiguous" and "means precisely what it says: no person shall be discriminated against in regard to housing because of that person's marital status." I further agree with the majority that the term "marital status" "connotes whether one is married or not married."

Here the record shows that under the applicable contractual covenant, C. Lynn Kuhr (Kuhr), a female, was entitled, without Greenbelt approval, to reside in a Greenbelt housing unit with Richard Searight (Searight), a male, if she was married to him. Kuhr, however, was not entitled, without Greenbelt approval, to reside in a Greenbelt housing unit with Searight if she was not married to him. Manifestly, under the applicable contractual covenant, Kuhr's right to reside in a Greenbelt housing unit with Searight depended upon whether she was "married or not married" and, therefore, depended upon her "marital status."

In sum, Kuhr was prohibited by the applicable contractual covenant from residing in a Greenbelt housing unit with Searight because she was "not married" or, in other words, "single." In my view, she was "discriminated against with regard to housing because of her marital status." *See, e.g., Hess v. Fair Employment & Housing Commission,* 138 Cal.App.3d 232, 234, 187 Cal.Rptr. 712, 714 (1st Dist.1982); *Atkisson v. Kern County Housing Authority,* 59 Cal. App.3d 89, 99, 130 Cal.Rptr. 375, 381 (5th Dist.1976); *Zahorian v. Russell Fitt Real Estate Agency,* 62 N.J. 399, 405, 301 A.2d 754, 757 (1973); *Loveland v. Leslie,* 21 Wash.App. 84, 87, 583 P.2d 664, 666 (Div. 1, 1978). Accordingly, I respectfully dissent.